UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                  Case No. 8:22-cr-330-TPB-LSG

MANUEL DOMINGOS PITA

SENTENCING MEMORANDUM

COMES NOW the United States of America, by and through its

representative, the undersigned Assistant United States Attorney, files with this

Court the following Sentencing Memorandum to aid the Court in the consideration

of various sentencing issues.  The United States submits as follows:

FACTUAL BACKGROUND

This indictment was the result of an extensive investigation of a family-related

conspiracy involving the creation and use of fraudulent shell construction companies.

These fraudulent shell construction companies existed to "rent" their allegedly fully-

insured construction workers to construction contractors to work on those

contractors' commercial and/or residential building projects in Florida.  These shell

construction companies often gave themselves names in order to create an air of

being in that line of business.  In reality, they were all small businesses, usually

owned and run by one person, and they generally employed minimal numbers of

actual employees.  They "rented" large numbers of other employees out, again and

again, to contactors to do work on construction sites throughout the Middle District

of Florida. The shell companies did not count those workers among the persons to be covered by their worker's compensation insurance policies.

The "employees" of these shell companies were mostly illegal aliens who were not permitted by law to work in the United States due to their alien status, and they were not covered by an adequate amount of worker's compensation insurance. In return for supplying these workers to the contractor jobsites, the shell companies received and cashed checks from those same contractors to pay these employees in cash for their labor. In this way, the contractors avoided paying employment taxes or any other taxes on their workers' wages, as they appeared on paper not to have employed these workers at all. Nor did the shell companies pay any employment taxes or other taxes on these workers' wages either. The scheme thus defrauded the IRS out of the required federal employment taxes related to those employees.

Construction Law Background

Under Florida law, any contractor or subcontractor engaging in any public or private construction is required to secure and maintain coverage valid under state law for worker's compensation insurance. FLA. STAT. § 440.10(1)(a). The state has also established formulas for the necessary amounts of coverage. Insurance companies apply those formulas in establishing the premium fees for their worker's compensation policies. A contractor is also required to obtain from its subcontractor evidence that the subcontractor has adequate worker's compensation insurance coverage for its workers. FLA. STAT. § 440.10(c). Failure to maintain worker's

compensation insurance is a felony offense under Florida law. FLA. STAT.
§ 440.105(a), (b), and (f).

Providers of worker's compensation insurance base the premiums they charge
for their policies and the amount of coverage they provide on the number of
employees a company has, the total annual payroll of those employees, and the type
of work those employees do. They use a standardized application form which their
clients complete and on which the insured company details its size, payroll, number
of employees, type of work, and other relevant information. Once the insured
company gets its coverage, it will then frequently provide proof of that coverage of its
employees in the form of a Certificate of Liability Insurance ("COI"), a document
declaring that the subcontractor has the requisite insurance coverage. This COI,
however, only states on its face that the business has worker's compensation
insurance and it does not include the number of workers that the policy covers or the
amount of payroll to which it pertains.

The entity that this defendant operated was essentially acting only as a "shell"
construction company. It would enter into arrangements with contractors and
subcontractors operating construction jobsites across Florida to provide workers at
their jobsites who were purported to be the employees of the shell company. The
shell company would receive "payroll checks" from the contractors or subcontractors
at the end of each week of work or project made payable to the shell company's
name. The defendant would cash those checks in order to pay these workers in cash
for their labor. In this way, the contractors would not appear to be the ones

3

employing those workers and the contractors would thus avoid payment of payroll, employment, and other taxes. The shell companies, too, evaded payment of any of those taxes, but they did collect a fee from the employing contractor/subcontractor for the "use" of their employees and for the service of shielding the contractors rom tax liability.

To carry out this scheme, the operators of these fraudulent shell companies would send wire transmissions in interstate commerce to numerous contractors or subcontractors containing COIs from their insurance companies. These COIs would falsely reflect that their company's employees had the requisite amount of worker's compensation insurance coverage. In actual fact, however, the total amount of employees and employee payroll which these policies covered far exceeded the number of employees and the total payroll that the insurance carriers knew about from the insurance applications that the shell companies had filed with them. The end result of this under-statement on the part of the shell construction company was that the premiums that the insurance company charged the shell company for the worker's compensation insurance it received was woefully inadequate to cover fully the actual number of workers performing these construction jobs in the event of an injury to one of the shell company's "employees".

Establishment of the scheme

The primary vehicle for this fraud scheme was the shell company Domingos 54 Construction ("Domingos 54"), Inc. MANUEL PITA formed the company in May 2018. He listed himself as the sole incorporator and "President" of the

4

corporation.  The principal place of business address for Domingos 54 changed in April 2020 to an address in Ocala, Florida. MANUEL PITA, however, remained as the registered agent of the business.

Once MANUEL PITA had a bank account available to him, he then needed to obtain worker's compensation insurance for his business to function. He did that by applying for that insurance with the aid of his son, Daniel. On May 16, 2018, MANUEL PITA obtained a policy with NorGUARD Insurance for the period between May 2018 and May 2019. In the application form to obtain that policy, under penalty of perjury, MANUEL PITA reported that the total payroll for the company during that period, including himself, was only $108,200. The form stated that company employees engaged in carpentry on detached one or two-family homes.

On May 1, 2019, Domingos 54 obtained a new policy through the American Builders Insurance Group. That policy covered the period from May 2019 through May 2020. In the May 1, 2019 application for that policy, MANUEL PITA reported that he was an interior framing subcontractor for residential homes. He estimated that the total payroll of the company for that time period was only $120,000.

American Builders Insurance Group canceled Domingos 54's policy on March, 2020 because a claim had been filed against Domingos 54 based upon an accident that had happened at one of their jobsites. A worker had fallen from a roof at the site on March 5, 2020 and later died. This accident was the basis for the charges in Count Three of the superseding information.

On May 4, 2020, Domingos 54 yet again obtained a new policy for worker's compensation coverage, this time from the FCCI Insurance Group. In his May 4, 2020 application for that coverage, MANUEL PITA reported that Domingos 54 had 15 employees with a total payroll for the year of $238,192. The form stated that the company was engaged in carpentry on detached one and two-family dwellings and residential framing. On April 30, 2021, MANUEL PITA filled out and submitted another application for insurance coverage from Method Insurance for the period from May 2021 through May 2022. His responses were consistent with those he had made in Domingos 54's application forms for the preceding years. He listed the business of the company as "Construction" and declared that the company had 8 employees with an estimate annual payroll of $160,000.

Contrary to its representations to its insurance companies, Domingos 54 was thus providing subcontracted labor to construction contractors. Yet Domingos 54 never issued a 1099 in any of those years to anyone, which is something it would have to do if it were, in fact, subcontracting those employees. In actuality, these "employees" did not exist and all Domingos 54 did was receive checks, cash them, and provide that cash back to pay those workers for their labor.

Scheme execution

Once they had insurance policies in place, the PITAs were soon able to execute the scheme and carry it out. They first had to have proof that Domingos 54 had adequate worker's compensation insurance. In the industry, the COIs performed that function. A construction company such as Domingos 54 would normally

6

request that its insurer send these COIs out to clients to verify coverage. The lack of specific detail in the COI form helped the scheme to progress since the COIs did not detail the extent of a company's coverage or even the number of employees covered. Both the defendant and his son, Daniel, caused the transmission of COIs to large numbers of their client construction contractors during the years of this scheme for the purposes of complying with the state law. At the same time, they were under-reporting drastically to their insurer the figures for their supposed employee and payroll numbers so as to be able to minimize their premium costs.

Bank records from Wells Fargo reflect that Domingos 54 obtained and cashed thousands of checks from contractors and subcontractors. The vast majority of these checks had no notations on them to reflect their purpose  Yet many did reflect the nature of the reasons for the check on the checks' face. For example, agents reviewed a limited sample of these checks and found 89 checks with the word "labor" in the memo section; 29 with the word "sub-contracting" in the memo section; 32 of the checks referenced "pay", and 20 checks referenced "work". Other checks bore the names of what appears to have been labor crew chiefs. Of note, 35 such checks contained a name in the memo section and of those 35 checks, 13 referenced not only that name but also what appears to be the location of the jobsite where his crew worked to earn the wages that that check represented.

<u>"Loss" Calculation"</u>

There is some dispute about the issue of "loss" in this case. The defendant has raised a number of objections to the estimation of loss which the United States has

set forth and to the calculation of that amount in the PSR. In the most recent version of the PSR, U.S. Probation has calculated a 22-level upward adjustment pursuant to USSG § 2B1.1(b)(1)(L), based upon a combined "loss" amount of $57,920.895. Doc. 172 at 14. That loss estimation represents a combination of losses to two sets of victims in this case. The loss figure which Probation urges represents a $22,792,547 loss to Domingos 54's workers' compensation insurance carriers, based upon the fraudulent misrepresentations by Domingos 54 as to the number of workers whom its worker's compensation policy covered. In addition, the loss figure includes the $35, 128,348 loss to the IRS due to the failure of Domingos 54 or anyone else to pay the required employment taxes on all of the workers to whom Domingos 54 paid cash for their labor. Id. at 13. This figure represents a conservative estimation of the employment taxes due by the employer of these workers. The defendant, calling those figures "inflated", urges the use instead of the $5,568,500 "gain" figure that the defendant appears to have earned as his share of the proceeds of this fraud scheme. Defendant Response to the PSR and Sentencing Memorandum at 6.

The Sentencing Commission has made it clear that in a case such as this, the "loss" adjustments means "the greater of actual loss or intended loss." USSG § 2B1.1(b). Notes to Table. "Actual loss" is the "reasonably foreseeable pecuniary harm that resulted from the offense"; "Intended loss" is the "pecuniary harm" that the defendant "purposefully sought to inflict". Id. A "loss" is "reasonably foreseeable" if the defendant knew, or under the circumstances "reasonably should have known" that it was "a potential result of the offense." Id. "Gain", on the other

hand, is not the favored measure of loss in such cases and may be an alternative "only if there is a loss but it reasonably cannot be determined." Id.

As to the calculation of the "loss" itself, the Court "need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence." USSG § 2B1.1, comment. (n.3(B) ). The Court is only required to make a "reasonable estimate of the loss" based upon "reliable and specific evidence". United States v. Ford, 784 F.3d 1386, 1396 (11th Cir. 2015). In considering the "loss" estimation, the "nature of the individual scheme must determine the correct way to measure the loss." United States v. Woodard, 459 F.3d 1078, 1087 (11th Cir. 2006). The Court need only establish a loss amount by a preponderance of the "'reliable and specific evidence.'" United States v. Annamalai, 939 F.3d 1216 (11th Cir. 2019) (quoting United States v. Medina, 485 F.3d 1291, 1304 (11th Cir. 2007)).

Loss to insurers (Count One)

With respect to the $22,792,547 loss in the PSR representing the losses to Domingos 54's worker's compensation insurers, the United States will submit as proof in aid of that position its calculation of what each insurer did charge Domingos 54, based upon the false representations that Domingos 54 made in its insurance applications. That schedule is attached as Exhibit One. That loss figure in Exhibit One is slightly lower than the one in the PSR due to a recent re-calculation of loss by American Builders Insurance.

9

In cases such as this one, courts have looked at the direct pecuniary harm that a defendant's misrepresentations in insurance applications causes to the insurer. In a closely analogous case involving the underreporting of employees for worker's compensation insurance in the mining industry, the Sixth Circuit held that the "avoided" or "unpaid" premiums represent the loss which an insured company causes by under-reporting its payroll for worker's' compensation insurance purposes. United States v. Simpson, 538 F.3d 459, 464 (6th Cir. 2008). Other courts have so held, including the Second Circuit which defined "actual loss" as "measured by the difference between the amount of premiums that [a company] should have paid but for the fraud and the amount it actually paid." United States v. Stevens, 210 F.3d 356, at *4 (2d Cir. Apr. 17, 2000) (unpublished), cert. denied, 121 S. Ct. 836 (2001). See also United States v. Leahy, 464 F.3d 773, 799-800 (7th Cir. 2006), cert. denied, 552 U.S. 911 (2007). Indeed, a court in this District has opined in the context of a Section 2255 motion involving very similar facts to this case that a court finding that "the intended loss amount in an insurance fraud scheme may be the difference between the premiums actually paid and the premiums the insurer would have charged" is not an "objectively unreasonable" estimate of loss in this context. United States v. Artica-Romero, No. 3:17-cr-44-J-34PDB, 2019 WL 447881, at * 9 (M.D. Fla. Feb. 5, 2019) (Howard, J.).

The defendant contends that such a loss figure is "inflated" because many of these workers neither contributed to the system nor received any benefit from it. Defendant's Sentencing Memorandum at 4. Yet the Sixth Circuit rejected a similar

10

claim, indicating that by providing coverage to a client, a worker's compensation insurer confers value on the client regardless of whether there is a claim made on the policy or not. That agreement to pay on a claim, even if it exceeds the premium paid on the policy, is the thing that the insurer gives up for value and the unpaid premiums thus represent the "fair market value" of the coverage that the defendant sought to obtain in this case. United States v. Simpson, 538 F.3d at 463.

The defendant further seeks to negate the use of this un-paid premium figure by contending that the workers' compensation insurance coverage that Domingos 54 obtained was based on the defendant's reporting in his insurance applications that his very few employees worked in the "carpentry" field. While it is true that there is no record of the type of work which every one of Domingos 54's thousands of "ghost" workers performed, the "carpentry" classification of work is a medium rate of premium coverage and is not the cheapest nor the most expensive rate for worker's compensation insurance coverage. It is also a field of work which matches or is close to the type of work that the defendant reported in most of his worker's compensation insurance applications. The use of this median classification of work type is thus a reasonable one, especially in a case where the allegation in Count Three, to which the defendant has pled guilty, involved an injury stemming from work by a Domingos 54 "employee" in the roofing trade. The rates for insurance coverage for roofing work are substantially more than those for carpentry due to such risks and the accident at the center of Count Three suggests that Domingos 54 "ghost" workers did, in fact, perform roofing work as well as other types of work.

Loss to the IRS (Count Two)

The defendant also has objected to the PRS's use of the estimated loss to the IRS of $35,128,348 due to the non-payment of employment taxes for Domingos 54 "workers". Doc. 72 at 12. The IRS provided those estimates to Probation and they are a "reasonable estimate" of the losses that the IRS sustained due to this Klein conspiracy.

The defendant objects to that calculation and insists that there is no "reasonable estimate" of these tax losses and, as a result, the Court should use the defendant's "gain" as its alternative measurement of the economic impact of this offense.

The IRS has determined that Domingos 54 received approximately $139,212,493 in checks between 2018 and 2022 from companies identified as being contractors or subtractors in the construction industry. The defendant received back in cash the vast majority of that sum of money and used that cash to make payments directly and indirectly to workers who worked under the aegis and protection of Domingos 54's worker's compensation insurance policies. Arguing that this total is inflated because some of that money represented the defendant's fee for participating in this scheme with these contractors and subcontractors, the defendant has objected to that base line figure.

The United States has made an adjustment to that baseline figure to accommodate that objection. Most operators of "shell constriction companies" charged these complicit contractors and subcontractors a fee for their services, that

fee being a percentage of the wages paid to workers during the life of the scheme. Here, too, the defendant charged his co-conspirators a fee and it was approximately 4%. Using that figure, the IRS deducted $5,568,500 from that larger total of cashed checks. IRS agents then calculated the employment taxes due on the remaining sum, applying the most conservative 10% employment tax rate to that figure. That calculation reduced the total employment taxes due to the IRS from this scheme to approximately $33,719,518.01. That figure represents the loss to the IRS under Count Two of the superseding indictment here. See summary chart attached hereto as Exhibit Two.

The defendant has objected to the "loss" calculation in the PSR by arguing that he was an employer and thus somehow not responsible for this employment tax debt. Aside from the fact that it is not at all clear that he was an "employer" of the individuals for whom he made cash payments available for labor, the offense in Count Two was conspiracy to obstruct, impede, and defeat the IRS in the ascertainment and collection of federal payroll taxes He was not charged under 26 U.S.C. § 7202. As a conspirator, along with his son and the numerous contractors and subcontractors who paid him and his company, the defendant is responsible for all acts and omissions of others that were "within the scope of the jointly undertaken criminal activity", acts "in furtherance of that criminal activity", and all "reasonably foreseeable [acts] in connection with that criminal activity. USSG § 1B1.3(a)(1)(B). This is consistent with the note to the loss table in USSG § 2B1.1 which reflects that for purposes of "loss" or "gain", a defendant is responsible for "[r]easonably

foreseeable pecuniary harm" as it is harm that a defendant "under the circumstances, reasonably should have known, was a potential result of the offense." USSG § 2B1.1 Notes to Table. See also United States v. Hunter, 323 F.3d 1314, 1319 (11th Cir. 2003).

The defendant has argued that the "loss" figure that Probation propounds is also inflated because the defendant used some of that those baseline receipts from contractors and subcontractors for raw materials or supplies. Defendant's Sentencing Memorandum at 5. However, he posits no evidence of this fact nor does he offer even an estimate of this purported alternate usage of those funds. Moreover, an IRS analysis of the deposits and disbursements from the Domingos 54 bank accounts between May 2018 and March 2022 reflects little or no expenditures by the defendant for such expenses. See summary schedule attached hereto as Exhibit Three. In fact, the vast majority of the funds that Domingos 54 received was withdrawn in cash. Records of Domingos 54 disbursements reflect that over $117,408,000 of those funds were withdrawn in cash between May 2018 and March 2022. Id. In addition, the U.S. Income Tax Returns for an S Corporation (Form 1120S) of Domingos 54 for tax years 2019-2022 do not reflect any such expenditures by the company either. See summary schedule attached hereto as Exhibit Four. They reflect no "cost of goods sold" deductions and very little for any supplies conceivably related to construction work.

This is consistent with the statements that the defendant made to his bookkeeper and tax prepare who worked for him between 2018 and 2020. According

14

to that individual. the defendant advised him that the cash that was withdrawn from the Domingos 54 accounts was used to pay subcontractors for labor. This statement is also especially interesting since the defendant repeatedly denied using any subcontractors in the various worker's compensation insurance applications that he filed between 2018 and 2022.

The checks that Domingos 54 received themselves reflect the fallacy of the defendant's arguments now as to loss. A review of the Domingos 54 Wells Fargo accounts shows that the individuals acting on behalf of Domingos 54 made 7,692 deposits totaling $80,075,333.68 between May 2018 and March 2021 alone. Agents looked at approximately 4,000 deposited checks for the period between May 2018 and February 2020. Of those, 3,000 checks had a blank memo line. Of the rest, agents found that over 160 contained a reference to pay or labor or work in the memo section. In addition, many of the checks also had memo sections which referred to types of work such as framing, stucco, roofing, and masonry. See summary schedule attached hereto as Exhibit Five. Some referenced a name of a person likely to be a work crew chief and some referenced an address, likely the location of a construction job site where Domingos 54 "employees" worked. All of those are additional circumstantial evidence that the checks in question were largely for the weekly payment of "ghost worker" wages.

<u>ADJUSTMENTS AND DEPARTURE GROUNDS</u>

In his memorandum, the defendant has argued for a number of downward departures on a number of different bases and against any upward role enhancement.

15

The United States submits that the final adjusted offense level calculation in the PSR is appropriate and that the facts in this case support those calculations. Consistent with its commitment in the plea agreement in this case, the United States stands ready not to oppose any request by the defendant for a sentence at the low end of the final adjusted offense level herein. It further opposes the numerous requests for departures and downward adjustments which the defendant has articulated in his sentencing memorandum.

Role Adjustment

The PSR recommends a two level upward adjustment in this case based upon the defendant's role as an organizer, leader, manager, or supervisor pursuant to USSG § 3B1.1(c). Doc. 172 at 14. To qualify for such an enhancement, the defendant must be an organizer, leader, manager, or supervisor of one or more participants. He may also qualify if he exercised such a role and "exercised management responsibility" over the property or assets or activities of a "criminal organization." USSG § 3B1.1, comment. (2). Factors for the Court to consider include the defendant's decision making authority, the nature of his participation in the offense, the degree and scope of the illegal activity, and the degree of control he exercised over others. USSG § 3B1.1, comment. (backg'd). The assertion of control over one individual is enough to support such an enhancement. United States v. Phillips, 287 F.3d 1053, 1058 (11th Cir. 2002).

Here, the facts establish that the defendant conspired with his son to create and manage Domingos 54. The defendant set up the shell business and the two had

signatory authority over its bank accounts for some of that time. The defendant and his son traveled to banks to cash checks and to withdraw funds. The defendant, with his son's assistance, completed and signed the workers compensation insurance applications which falsified the nature and extent of Domingos 54's payroll and the numbers of ghost workers each such policy would cover. Both the defendant and his son requested and caused the transmission of certificates of insurance to the dozens of contractors and subcontractors who provided Domingos 54 with a large influx of checks made payable to Domingos 54 and which funded the wages of these "ghost" workers. Surveillance evidence reflects travels by the defendant to the business offices of some of those contractors and subcontractors. In addition, the defendant was engaged in the preparation of false and fraudulent tax forms such as Domingos 54's 1120S forms and 941 Quarterly Federal Tax forms which failed to identify the payment of those cash wages to those workers and which failed to collect the federal employment taxes due on those wages.

As such, the defendant's role in this case also affects the application of USSG § 4C1.1 to him. Despite his lack of any criminal record, his organizational role in this scheme negates the applicability of any downward adjustment to his Guideline range under USSG § 4C1.1 due to his aggravating role adjustment. USSG § 4C1.1(a)(10).

Overstatement of Seriousness of the Offense

In his sentencing memorandum, the defendant argues that the PSR's loss figure is overstated. He bases this request for a downward departure upon language

in USSG§ 2B1.1 which suggest that such an overstatement of the seriousness of the offense might be warranted if it is "substantial". USSG § 2B1.1, comment. (n. 21 (C)).

The facts set forth above reflect the substantial nature of the defendant's conduct and the losses that it caused. His actions led to a loss by his worker's compensation insurance of more than $22,000,000 and a loss of employment tax revenue to the IRS in excess of $33,000,000. These numbers are highly "substantial" and represent a major economic loss to both sets of victims.

The Guidelines set forth one example of a qualifying "substantial overstatement" where the losses are shared by so large a number of victims such that each individual victim's loss is diffuse and relatively small. Id. This is not such a case. Moreover, one court in this District has laid out some guidance as to how to apply this downward departure. It adopted the guidance from a Wisconsin court which identified four scenarios where such a downward departure might be appropriate: (1) multiple causes of the loss in addition to the defendant's conduct; (2) cases where the defendant pays a limited role in the scheme or had little effect on the loss amount; (3) efforts by the defendant to remedy the wrong, such as pledging assets to cover the loses; or (4) cases where the loss was intended rather than actual and the scheme is doomed to cause little or no loss. United States v. Lamonda, No. 6:05-cr-131-Orl-28UAM, 2008 WL 69744, at * 22 (M.D. Fla. Jan. 2, 2008) (Antoon, J.), aff'd, 384 F. App'x 944 (11th Cir. 2010)). None of those scenarios fit the crimes here or the defendant's pattern and activity. The defendant and his co-conspirators

18

caused massively large losses to the separate victims of this fraud scheme and his company and his activities played a major role in causing that loss. He has made no voluntary moves to remedy his wrongs to date.

Extraordinary Restitution

The defendant has also argued for a downward departure or perhaps a variance based upon the nature of the restitution in this case. In his sentencing memorandum, he has suggested that the defendant's efforts in this regard were "extraordinary". Defendant's Sentencing Memorandum at 13-14.

Extraordinary restitution and remorse is a "discouraged" grounds for a downward departure but it is not a prohibited ground. United States v. Crawford, 407 F.3d 1174, 1182 (11th Cir. 2005).The Eleventh Circuit has made clear that any departure on such a grounds must look to a wide range of factors, including the degree of voluntariness of this restitution, the efforts the defendant went through to make the restitution, if any, the amount of funds restored, and the timing of it. United States v. Kim, 364 F.3d 1235, 1244 (11th Cir. 2004). That court affirmed such a downward departure only because it found that defendant to be among the "rare defendants" who demonstrate "extraordinary remorse and acceptance of responsibility by making extraordinary restitution." Id. at 1245.

This is not such a case. The real properties and the amounts of cash which the defendant stands to lose as a consequence of this case were not his "voluntary" gifts of assets to help compensate his victims which he delivered either before or after his indictment. They were assets which the United States seized pursuant to legal

19

process at the time of the defendant's indictment. He did not tender any of those assets, aside from the one additional asset which he claims he now wishes to contribute but fails to identify in his sentencing memorandum. It is not at all clear what that asset is or where it is. Moreover, the defendant has tendered none of the real or personal property assets that he caused to be moved overseas during the course of his crimes and thus beyond our current ability to forfeit or seize. To date, the United States is not aware that he has re-patriated any of those assets to help compensate his victims. His conduct has been that of the routine defendant and there is nothing "rare" or "extraordinary" about it.

Age and Medical Condition

These are also factors which the defendant has raised in his sentencing memorandum and upon which he seeks to base a request for a downward departure.

Age "may" be relevant in determining whether a downward departure is warranted in a case, but only in a situation where the defendant is "elderly and infirm". USSG § 5H1.1. The defendant is 69 years old and has some medical conditions. However, none of them seem beyond the ability of the Burau of Prisons to manage in the event this Court sentences the defendant to a term of imprisonment.

Physical condition is also a factor that "may" be relevant in determining whether a downward departure is warranted. USSG § 5H1.4. It is a "discouraged" basis for a departure and is only to be applied in " 'exceptional cases' ". United States v. DeVegter, 439 F.3d 1299, 1306 (11th Cir. 2006) (quoting Koon v. United States, 518 U.S. 81, 95 (1996)). Yet it is only warranted where it is present "to an

unusual degree and distinguishes the case from the typical cases covered by the guidelines." USSG § 5H1.4. An "extraordinary physical impairment" may be a reason for such a departure but the Guidelines appear to restrict even that to cases of a "seriously infirm defendant". Id. Again, the defendant does not appear to meet such a definition and his medical conditions appear to be conditions that the Bureau of Prisons medical staff can handle.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By:    _/s/ Jay L. Hoffer_
JAY L. HOFFER
Assistant United States Attorney
Florida Bar No. 0910708
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
Facsimile:    (813) 274-6358
E-mail: Jay.Hoffer@usdoj.gov

**U.S. v. Manuel Pita**                    **Case No. 8:22-cr-330-TPB-LSG**

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2025, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice of

electronic filing to the following:

David W. Macey, Esq.


/s/ *Jay L. Hoffer*
JAY L. HOFFER
Assistant United States Attorney
Florida Bar No. 0910708
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
Facsimile:    (813) 274-6358
E-mail: Jay.Hoffer@usdoj.gov